UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


MARY M. MONTELEONE, *et al.*                    CIVIL ACTION

VERSUS                                          NO. 26-494

CMH HOMES, INC. d/b/a FREEDOM                   SECTION M (1)
HOMES 650, *et al.*


**ORDER & REASONS**

Before the Court is a motion to compel arbitration and stay proceedings filed by defendants

CMH Homes, Inc. d/b/a Freedom Homes 650 ("CMH Homes"), Wimbledon Properties, LLC

("Wimbledon Properties"), and Clayton Properties Group, Inc. ("Clayton Properties")

(collectively, "Defendants").[1]    Plaintiffs Mary M. Monteleone ("Mary"), along with Katie

Monteleone ("Katie") and William Monteleone ("William"), individually and on behalf of their

minor children G.M. and D.M. (collectively, "Plaintiffs"), respond in opposition,[2] and Defendants

reply in further support of their motion.[3]   Having considered the parties' memoranda, the record,

and the applicable law, the Court grants the motion as to the claims brought by Mary and by Katie

and William in their individual capacities, which are compelled to arbitration, but denies the

motion as to the claims brought by Katie and William on behalf of the minor children G.M. and

D.M.   The entire case is stayed pending arbitration.

I.    **BACKGROUND**

This case concerns a defective manufactured home.   On September 27, 2023, Mary

purchased from CHM Homes a modular home that was manufactured by Wimbledon Properties

---

[1] R. Doc. 16.
[2] R. Doc. 18.
[3] R. Doc. 20.

and Clayton Properties.[4]  Mary signed various documents in person and via electronic signature on the date of the closing, including a sales agreement, a retailer closing agreement, and a binding dispute resolution agreement ("BDRA").[5]  The sales agreement and retailer closing agreement both referenced the BDRA.[6]  The retailer closing agreement states:

> Buyer has read and agreed to be bound by the terms of this Retailer Closing Agreement consisting of four (4) pages, which is entered into as of the date referenced below and which, together with the final Purchase or Sales Agreement, and any arbitration/dispute resolution agreement, contains the entire agreement of the parties with respect to the purchase of the Home.[7]

The sales agreement similarly states:

> This Sales Agreement, including any addenda, the Retailer Closing Agreement, and any arbitration/dispute resolution agreement establish the complete agreement between Buyer and Seller and there are no other agreements, unless evidenced in writing and signed by the parties.[8]

The BDRA provides that "the [p]arties … agree to resolve all disputes pursuant to [its] terms," which broadly require mediation and, if unsuccessful, arbitration.[9]  It defines the "[p]arties … as the buyer … who signs below … and CMH Homes, Inc., and their/its agents, assignees, successors in interests, and employees (collectively referred to as 'Seller')."[10]  The buyer (Mary) and seller (CMH Homes) also agreed that the BDRA "applies to and governs the rights of intended beneficiaries to this [a]greement," including, among others, the manufacturer and any occupants of the home, which are collectively defined as "Beneficiaries."[11]  The BDRA specifies its scope as follows:

> This Agreement applies to all pre-existing, present, or future disputes, claims, controversies, grievances, and causes of action against Seller, including, but not

---

[4] R. Doc. 2-1 at 7.
[5] R. Docs. 16-1 at 2; 18 at 8-11; 18-2; 18-3; 20 at 3-5.
[6] R. Docs. 18-2 at 37; 18-3 at 34.
[7] R. Doc. 18-2 at 37.
[8] R. Doc. 18-3 at 34.
[9] *Id.* at 10.
[10] *Id.*
[11] *Id.*

limited to, common law claims, contract and warranty claims, tort claims, statutory claims, administrative law claims, and any other matter in question, not otherwise excepted herein, arising out of or relating to (i) the modular or manufactured home(s) purchased, sold, owned, occupied and/or delivered in any transaction with Buyer or Beneficiaries (the "Home"), (ii) the documents related to the purchase and sale of the Home (including, but not limited to, the Retailer Closing Agreement, any Purchase or Sales Agreement, buyer's order, supplemental invoice, and other instruments and agreements whereby Seller purports to convey or receive any goods or services to or from Buyer or Beneficiaries (collectively, the "Contract")), (iii) any products, goods, services, insurance, supplemental warranty, service contract, and real property (including improvements to the real property) sold under or referred to in the Contract, (iv) any events leading up to the Contract, (v) the collection and servicing of the Contract, (vi) the design and construction of the Home, and (vii) the interpretation, scope, validity and enforceability of the Contract (collectively referred to as the "Claim" or "Claims").  Notwithstanding anything herein to the contrary, the jurisdiction of the Arbitrator, including objections with respect to the existence, scope, and validity of this Agreement, shall be determined solely by a court of competent jurisdiction, and not by the Arbitrator. … [12]

Despite the broad reach of the BDRA, it provides a carveout from the mediation and arbitration requirements for consumer credit transactions secured by a dwelling.[13]  The BDRA also excepts from its provisions certain actions by the seller, stating that:

… Seller may use judicial process (filing a lawsuit): (a) to obtain possession of the Home where Seller has not been paid in full as agreed under the Contract or to otherwise enforce Seller's ownership interest in the Home, or enforce any related mortgage or deed of trust in Seller's name, and (b) to seek preliminary relief, such as a restraining order or injunctive relief, in order to preserve the existence, location, condition or productive use of the Home or other property.[14]

The BDRA concludes with the following paragraph that appears in all capital letters and bold font, directly above the buyer's signature:

**NOTICE:  BUYER UNDERSTANDS THAT THIS DISPUTE RESOLUTION AGREEMENT IS AN IMPORTANT AGREEMENT AND THAT THE TERMS OF THIS AGREEMENT AFFECT BUYER'S LEGAL RIGHTS. BY SIGNING THIS DISPUTE RESOLUTION AGREEMENT, BUYER ACKNOWLEDGES THAT BUYER HAS READ, UNDERSTANDS AND AGREES TO BE BOUND BY THIS AGREEMENT.  BUYER AND SELLER FURTHER INTEND TO DIRECTLY BENEFIT AND BIND ALL**

---

[12] *Id.*
[13] *Id.*
[14] *Id.* at 12.

**BENEFICIARIES TO THIS AGREEMENT. IF BUYER DOES NOT UNDERSTAND ANY OF THE TERMS OR PROVISIONS OF THIS AGREEMENT, INCLUDING ADVANTAGES OR DISADVANTAGES OF ARBITRATION, THEN BUYER SHOULD SEEK INDEPENDENT LEGAL ADVICE BEFORE SIGNING THIS AGREEMENT. THE PARTIES HEREBY WAIVE THEIR RIGHTS, IF ANY, TO TRIAL BY JUDGE OR JURY, WHERE APPLICABLE. THE PARTIES HAVE ENTERED INTO THIS AGREEMENT KNOWINGLY, WILLINGLY AND VOLUNTARILY.**[15]

Mary electronically signed the BDRA on September 27, 2023.[16]

The home was delivered and constructed on Mary's property in February 2024.[17] Shortly afterwards, Katie, William, and their minor child G.M. moved into the home.[18] D.M. was born in early August 2024 and also resided in the home.[19] At some unspecified time after delivery, Plaintiffs began to notice mold throughout the home.[20] They attempted to clean it to no avail.[21] Plaintiffs contacted Defendants concerning the ongoing mold issue.[22] Defendants sent out contractors, who acknowledged the mold problem, took steps to remediate it, and made repairs to stop it.[23] The efforts were in vain, though, as mold continued to reappear and spread throughout the home.[24] Plaintiffs claim that the mold problem was caused by a design defect and construction flaw in the home's ventilation system.[25] Katie, William, G.M., and D.M., as the occupants of the home, allege that toxic mold exposure has caused them to suffer various health problems, including, but not limited to, immune system suppression, sleep issues, neurological issues, gastrointestinal issues, liver damage, DNA damage, sleep disturbances, cognitive function

---

[15] *Id.* at 13 (emphasis original).
[16] *Id.*
[17] R. Doc. 2-1 at 7.
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.* at 7-8.
[24] *Id.* at 8.
[25] *Id.*

deficiencies, kidney damage, slowed neurological development (in the children), mitochondrial stress, synergistic toxicity, allergies, sensory symptoms, fatigue, and irritability.[26]  They also claim that they have sustained property damage caused by the mold, incurred medical expenses and expenses to find an alternative residence, and suffered mental anguish and emotional distress.[27]  Plaintiffs, via oral declarations, emails, and text messages, have demanded that Defendants fix the problem, but Defendants have not been able to repair or remedy the design and construction defect in the ventilation system, which continues to cause the growth and spread of mold.[28]

On January 5, 2026, Plaintiffs filed this suit against Defendants in Louisiana state court alleging various claims arising under Louisiana state law, such as: the New Manufactured and Modular Home Warranty Act ("NMMHWA"), La. R.S. 51:912.1, *et seq.*; bad faith and redhibition; the Louisiana Products Liability Act ("LPLA"), La. R.S. 9:2800.51, *et seq.*; the Louisiana Unfair Trade Practices Act ("LUTPA"), La. R.S. 51:1401, *et seq.*; and negligence.[29]  Defendants timely removed the action to this Court, asserting diversity subject-matter jurisdiction under 28 U.S.C. § 1332.[30]

## II.    PENDING MOTION

Defendants jointly move to compel arbitration and stay these proceedings, arguing that, when Mary bought the modular home, she signed a broad, binding arbitration agreement that encompasses the claims made in this suit.[31]  Pointing to the strong public policy in favor of arbitration, Defendants argue that Plaintiffs' claims must be arbitrated because the arbitration

---

[26] *Id.* at 13.

[27] *Id.* at 14.

[28] *Id.* at 8.

[29] *Id.* at 6, 8-14.  Other than noting that Katie, William, and their children reside in the home and allegedly suffered the health and other consequences of the mold exposure, the complaint does not differentiate the claims they make from the claims made collectively by "Plaintiffs." *See id.* at 1-14.

[30] R. Doc. 2 at 1-9.  It is undisputed that Plaintiffs and all Defendants are completely diverse and there is more than $75,000 in controversy.

[31] R. Doc. 16.

agreement – the BDRA – is valid and enforceable.[32]  Defendants further contend that Wimbledon

Properties and Clayton Properties, as nonsignatories, can enforce the BDRA because all of

Plaintiffs' claims allege substantially interdependent and concerted misconduct against all

Defendants, and the BDRA incorporates the nonsignatory defendants by reference as third-party

beneficiaries of the contract.[33]

In opposition, Plaintiffs argue that Defendants' motion should be denied for three primary

reasons.[34]  First, Plaintiffs contend that, as nonsignatories to the BDRA, Katie and William cannot

be bound by its terms as to their tort claims.[35]  Next, Plaintiffs argue that, under Louisiana Civil

Code article 3101, Katie and William cannot bind their minor children to arbitration without

judicial authorization, which they do not have.[36]  Finally, Plaintiffs contend that the BDRA is

unenforceable because Mary signed it in error and it is a contract of adhesion.[37]  With respect to

error, Plaintiffs assert that Mary cannot be held to the terms of the BDRA because she was not

presented with the BDRA when she signed the sales agreement and retailer closing agreement in

person.[38]  She received the BDRA later the same day in an electronic closing package and believed

that her signature was required to complete the purchase of her home.[39]  Plaintiffs say that the

purchase was already completed when Mary received the BDRA, and thus Mary signed the

arbitration agreement erroneously believing that it was required to complete the purchase.[40]

Alternatively, Plaintiffs argue that the BDRA was adhesionary because it was presented to Mary

---

[32] R. Doc. 16-1 at 4-9.

[33] *Id.* at 9-12.

[34] R. Doc. 18 at 1-15.  Plaintiffs do not contest the ability of Wimbledon Properties and Clayton Properties to invoke the arbitration clause.  *See id.*

[35] *Id.* at 6-8.

[36] *Id.* at 8.

[37] *Id.* at 8-14.

[38] *Id.* at 10-11.

[39] *Id.*

[40] *Id.*

electronically in the middle of a 49-page packet that required 15 separate signatures, Defendants

had relatively more bargaining power, and the BDRA lacks mutuality in that Mary is not afforded

any right to seek emergency relief in judicial process and the BDRA survives Mary's assignment

of the contract.[41]

Defendants reply, arguing that Plaintiffs offer no proof, such as a sworn statement or

affidavit, to support their error argument.[42]   And, say Defendants, the Court cannot rely on

unsubstantiated statements in an opposition to deny arbitration.[43]   Defendants further argue that

Mary signed the BDRA with full knowledge of all clauses.[44]   As evidence, Defendants point to

the fact that Mary signed the BDRA on the same day that she signed the retailer closing agreement

and sales agreement, which both specifically reference the inclusion of the BDRA and state that

all of the documents together constitute the entire agreement between the parties.[45]   Thus, say

Defendants, Mary was on notice of the BDRA's existence and signed it at the same time as the

other documents.[46]  With respect to Katie, William, and their children, Defendants argue that their

claims are subject to the BDRA because "the indistinguishable identity of claims [among

Plaintiffs] mandates that all claims be decided together" to avoid the risk of inconsistent rulings

and judgments and in the interests of judicial economy and efficiency.[47]  Defendants also point out

that the construction defect claims are governed by the NMMHWA, which applies equally to the

owner/purchaser and invitees who occupy the residence.[48]  Defendants further contend that Katie,

William, and their children, as third-party beneficiaries, are bound by the terms of Mary's contract

---

[41] *Id.* at 11-14.
[42] R. Doc. 20 at 1-3.
[43] *Id.*
[44] *Id.* at 3-5.
[45] *Id.* at 3.
[46] *Id.*
[47] *Id.* at 5-7 (quote at 7).
[48] *Id.* at 7.

with CMH Homes, including the BDRA, or are equitably estopped from disavowing the BDRA as the persons who receive the direct benefits of the overall contract.[49]  Although Defendants press for arbitration of all claims, they alternatively ask the Court to compel Mary's claims to arbitration and stay those of the nonsignatories while the arbitration proceeds.[50]

## III.    LAW & ANALYSIS

"[T]here is a 'strong federal policy in favor of enforcing arbitration agreements.'" *Texaco Expl. & Prod. Co. v. AmClyde Engineered Prods. Co.*, 243 F.3d 906, 909 (5th Cir. 2001) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217 (1985)).  Section 3 of the Federal Arbitration Act ("FAA") provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court ... shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement ....[51]

9 U.S.C. § 3.  "'If the issues in a case are within the reach of that arbitration agreement, the district court has no discretion under section 3 to deny the stay.'" *Texaco Expl. & Prod. Co.*, 243 F.3d at 909 (alterations omitted) (quoting *In re Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 754 (5th Cir. 1993)).

The Fifth Circuit has explained that "the FAA puts arbitration agreements on the same footing as other contracts." *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 166 (5th Cir. 2004).  This means that, "as a matter of federal law, arbitration agreements and clauses are to be enforced unless they are invalid under principles of state law that govern all

---

[49] *Id.* at 7-10.
[50] *Id.* at 10.
[51] The FAA governs this dispute, which involves commerce between two states in that a citizen of Louisiana (Mary) entered into a contract with a citizen of Tennessee (CMH Homes).  *See* 9 U.S.C. §§ 1, 2; *Perry v. Thomas*, 482 U.S. 483, 490 (1987) (stating that the FAA "embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause").

contracts." *Id.* (emphasis omitted). "Therefore, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening" the FAA. *Id.* (quotation and emphasis omitted).

Generally, "a court must hold a party to its arbitration contract just as the court would to any other kind [of contract]." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022). In doing so, courts perform a two-step analysis to determine whether parties should be compelled to arbitrate a dispute. They must determine: (1) "whether the party has agreed to arbitrate the dispute"; and (2) "whether 'any federal statute or policy renders the claims nonarbitrable.'" *Jones v. Halliburton Co.*, 583 F.3d 228, 233-34 (5th Cir. 2009) (quoting *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008)). The first step is further divided into two additional questions, requiring a court to ask: "(1) is there a valid agreement to arbitrate the claims and (2) does the dispute in question fall within the scope of that arbitration agreement"? *Id.* at 234 (quotation omitted).

### A. Mary's Claims

#### 1. Validity of the arbitration agreement

The determination of whether the parties agreed to arbitrate the dispute "is generally made on the basis of 'ordinary state-law principles that govern the formation of contracts.'" *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Under Louisiana law, a valid contract requires: (1) capacity to contract; (2) consent; (3) lawful cause; and (4) a valid object. La. Civ. Code arts. 1918, 1927, 1966, 1971. Here, Mary argues that the BDRA is invalid under Louisiana contract law because she signed it in error or, alternatively, it is an adhesionary contract.[52]

---

[52] R. Doc. 18 at 9-14.

9

### a. Error

Louisiana Civil Code article 1948 provides that consent to a contract "may be vitiated by error, fraud, or duress." "Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party." La. Civ. Code art. 1949. "Error may concern a cause when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, or should in good faith have regarded, as a cause of the obligation." La. Civ. Code art. 1950. "A court cannot relieve an able party of an obligation into which he freely and voluntarily entered absent evidence of a vice of consent." *Finta-Volpati v. Volpati*, 428 So. 3d 759, 768 (La. App. 2025) (citation omitted).

Plaintiffs assert that Mary erred in signing the BDRA because she was not presented with it when she signed the sales agreement and retailer closing agreement in person and yet believed she had to sign it to complete the contract, even though, in Plaintiffs' view, the sale was already confected.[53]  In making this argument, Plaintiffs rely on *Rodriguez v. Ed's Mobile Homes of Bossier City*, 889 So. 2d 461 (La. App. 2004), and *Quebedeaux v. Sunshine Homes Inc.*, 941 So. 2d 162 (La. App. 2006).[54]  In *Rodriguez*, the appellate court affirmed the trial court's finding that the plaintiffs signed the arbitration agreement in error because the parties entered into a contract to purchase a mobile home when the plaintiffs paid the $7,000 downpayment and signed the original agreement, weeks before the closing where the arbitration agreement was first presented to them.  889 So. 2d at 464.  Similarly, in *Quebedeaux*, the appellate court affirmed the district court's finding that an arbitration clause was vitiated for error when there was no discussion about,

---

[53] R. Doc. 18 at 9-11.
[54] *Id.* at 9-10.

nor agreement to, an arbitration clause at the time the original purchase agreement was signed and the $15,000 deposit paid.  941 So. 2d at 164-65.

At first blush, the facts of *Rodriguez* and *Quebedeaux* might appear to be analogous to this case.  However, there is a material distinction.  It is true that Mary paid a $500 downpayment in July 2023, months before the closing, but there is no evidence that she signed a purchase agreement at that time or that the downpayment was nonrefundable until further paperwork was executed.[55] Moreover, she was presented with, and signed, the arbitration agreement on the same day that she signed the retailer closing agreement and the sales agreement, which both specifically reference the arbitration agreement and state that the three contracts together constitute the parties' agreement.[56]  In fact, the sales agreement appears later in the same electronically signed packet as the BDRA.[57]  Thus, she arguably signed the arbitration agreement *before* the sales agreement, meaning that the sale was not perfected at the time the arbitration agreement was signed. Regardless, Mary electronically signed at the bottom of the BDRA acknowledging that she read and understood it.  There was no error.

### b.  Adhesionary contract

Louisiana courts consider four factors in determining whether a contract is adhesionary: "(1) the physical characteristics of the arbitration clause; (2) the distinguishing features of the arbitration clause; (3) the mutuality of the arbitration clause; and (4) the relative bargaining strength of the parties." *Mapp, LLC v. Floor & Decor Outlets of Am., Inc.*, 2025 WL 2732375, at *5 (E.D. La. Aug. 25, 2025) (citing *Duhon v. Activelaf, LLC*, 411 So. 3d 605, 611 (La. 2016)).

---

[55] R. Doc. 18-1 at 2.   The sales agreement, which Mary signed on September 27, 2023, provides that, if the sale was cancelled by the buyer, the seller could retain a portion of any cash deposit to offset expenses.  R. Doc. 18-3 at 33.  Thus, the deposit was more in the nature of earnest money.

[56] 18-2 at 37; 18-3 at 13, 34.

[57] *See* R. Doc. 18-3 at 10-13 (BDRA), 32-35 (sales agreement).

11

Plaintiffs focus on mutuality and the relative bargaining strength of the parties to argue that the BDRA is adhesionary, while also mentioning its distinguishing features.[58]  Plaintiffs' arguments fail.  The BDRA is not adhesionary under the *Duhon* factors.  The clause is conspicuous, appearing on the ninth through twelfth pages of the closing packet.[59]  It begins with the heading "**<u>BINDING DISPUTE RESOLUTION AGREEMENT</u>**," and the body of the provision appears in clear, legible font that is the same, standard size as the rest of the surrounding provisions.  The BDRA is mutual.  It states that the "Parties … agree to resolve all disputes pursuant to [its] terms."[60]  The carveouts that allow Defendants to file lawsuits to enforce mortgage rights and other consumer credit transactions do not destroy the agreement's mutuality.  *See Bernard v. Kabco Builders, Inc.*, 2016 WL 8710076, at *7-9 (W.D. La. Feb. 12, 2016) (holding that reservation of the right to litigate specific claims related to enforcement of monetary obligations secured by the manufactured home did not render the arbitration agreement unenforceable for lack of mutuality), *adopted*, 2016 WL 937381 (W.D. La. Mar. 3, 2016); *see also Brown v. CMH Mfg., Inc.*, 2014 WL 4298332, at *11 (S.D.W. Va. Aug. 29, 2014) (finding that the BDRA was mutual because "only certain identified claims brought by the [s]eller that relate to recovery of the collateral" were excluded).  Additionally, Mary has not demonstrated that she did not have adequate bargaining strength or the capacity to read and understand the policy terms before agreeing to them.  She could have walked away from the contract and bought a modular home from another dealer.  Indeed, the BDRA itself advises the buyer to seek legal counsel if concerned about the rights and obligations established by the agreement.  "'In Louisiana, a party who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not

---

[58] R. Doc. 18 at 12-14.

[59] R. Doc. 18-3 at 10-13.  The filed exhibit has a cover sheet, which affects the numbering of the pages in CM/ECF.

[60] *Id.* at 10.

read it, that he did not understand it, or that the other party failed to explain it to him.'" *Georgetown Home Owners Ass'n, Inc. v. Certain Underwriters at Lloyd's, London*, 2021 WL 359735, at *13 (M.D. La. Feb. 2, 2021) (quoting *Geovera Specialty Ins. Co. v. Odoms*, 836 F. App'x 197, 202 (5th Cir. 2020)).

### 2. Scope of the arbitration agreement

Having found that there is a valid agreement to arbitrate between Mary and Defendants, the Court turns to the question of the BDRA's scope. "Courts apply a strong presumption in favor of arbitrability when deciding whether a party's claims fall within the scope of an arbitration provision." *Evans v. CMH Homes, Inc.*, 2024 WL 5110178, at *3 (E.D. La. Dec. 13, 2024) (citing *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

The BDRA is a broad arbitration agreement binding the parties "to resolve all disputes pursuant to [its] terms."[61] It "applies to all pre-existing, present, or future disputes, claims, controversies, grievances, and causes of action against Seller, including, but not limited to, common law claims, contract and warranty claims, tort claims, statutory claims, administrative law claims, and any other matter in question, not otherwise excepted herein, arising out of or relating to (i) the modular or manufactured home(s) purchased, sold, owned, occupied and/or delivered in any transaction with Buyer or Beneficiaries (the 'Home'), … (vi) the design and construction of the Home, and (vii) the interpretation, scope, validity and enforceability of the Contract (collectively referred to as the 'Claim' or 'Claims')."[62] By its terms, the BDRA clearly applies to the claims Mary asserts in this case. *See Evans*, 2024 WL 5110178, at *3-4 (finding

---

[61] R. Doc. 18-3 at 10.
[62] *Id.*

13

that plaintiff's breach-of-warranty, tort, and breach-of-contract claims fall within the terms of an arbitration agreement identical to the BDRA at issue here); *see also Wisener v. CMH Homes, Inc.*, 2022 WL 17839010, at *1, 5 (N.D. Ala. Dec. 21, 2022) (finding that all of plaintiffs' claims, which included various torts, breach of contract, and breach of warranty, fell within the scope of an arbitration agreement identical to the BDRA here because they "all arise from and relate to the manufacture, purchase, and installation of the home").   Thus, Mary's claims must all be arbitrated.[63]

## B. Katie and William's Individual Claims

Having found that Mary entered into a valid arbitration agreement and that its scope encompasses Mary's claims, the Court turns to Katie and William's individual claims.  Plaintiffs, citing *Snyder v. Belmont Homes, Inc.*, 899 So. 2d 57 (La. App. 2005), *Billieson v. City of New Orleans*, 863 So. 2d 557 (La. App. 2003), and *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301 (10th Cir. 2017), argue that Katie and William's individual tort claims are not subject to arbitration because they are not signatories to the arbitration agreement.[64]  In *Snyder*, the court held that a nonsignatory's tort claims were not subject to arbitration because "there [was] no evidence she knew about the agreement, was obligated by it, that it was incurred on her behalf, or that she benefited from it."  899 So. 2d at 64.  Similarly, in *Billieson*, the court held that the tort claims of nonsignatories to an arbitration agreement were not subject to that agreement because the claims were not associated with the enforcement of the contract and did not fall within the parameters of

---

[63] Step two of the Fifth Circuit's two-part test for arbitrability requires courts to determine whether any federal statute or policy renders a party's claims nonarbitrable. *See Jones*, 583 F.3d at 234.  Plaintiffs do not address this prong. *See* R. Doc. 18.  Nevertheless, the Court notes that it is unaware of any federal policy or statute that forecloses arbitration of Plaintiffs' claims. *See Evans*, 2024 WL 5110178, at *4; *see also Bernard*, 2016 WL 8710076, at *4-6 (holding that the NMMHWA does not prohibit binding arbitration of such a claim).

[64] R. Doc. 18 at 6-8.  Every claim in the complaint (including the claims violations of the NMMHWA, LPLA, and LUTPA; bad faith and redhibition; and negligence) is alleged on behalf of all Plaintiffs. *See* R. Doc. 2-1.  Plaintiffs do not contest that Katie and William's individual non-tort claims are subject to arbitration. *See* R. Doc. 18.

the arbitration agreement.  863 So. 2d at 562.  Lastly, in *Jacks*, the Tenth Circuit held that the husband and child of a woman who bought a mobile home from CMH Homes were not subject to the BDRA because they were not signatories to it and "Defendants fail[ed] to cite Oklahoma law supporting their direct-benefits-estoppel theory."  856 F.3d at 1306.

Plaintiffs argue that the result here "should be no different" than in the cited cases.[65] However, it must be.  Unlike the Oklahoma law applied in *Jacks*, Louisiana law permits arbitration agreements to apply to nonsignatories by direct-benefits estoppel "when the nonsignatory knowingly exploits the contract containing the arbitration clause and obtains a direct benefit from that contract." *Traders' Mart, Inc. v. AOS, Inc.*, 268 So. 3d 420, 427-28 (La. 2019) (quote at 428). The knowledge element is satisfied if the nonsignatory has "actual knowledge of the contract containing the arbitration clause." *Id.* at 428. "Direct benefits estoppel involves nonsignatories who, during the life of the contract, have embraced the contract despite their nonsignatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Id.* "A nonsignatory can 'embrace' a contract containing an arbitration clause in two ways: (1) by knowingly seeking and obtaining 'direct benefits' from the contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract." *Id.*

It is clear that Katie and William have knowledge of Mary's contract with Defendants and that they embraced it by both seeking direct benefits (*viz.*, living in the home) and seeking to enforce its terms through the assertion of several claims that must be determined by reference to the contract, including claims under the NMMHWA.  The complaint states that Plaintiffs, collectively, make all of the claims against Defendants and that they have contacted Defendants in

---

[65] *Id.* at 7.

15

attempts to remediate the mold issue.[66]  And the complaint states further that Mary purchased the home for Katie and William, making them express direct beneficiaries of the contract.[67]  In sum, Katie and William are bound to the BDRA through direct-benefits estoppel.

### C.  Katie and William's Claims Brought on Behalf of G.M. and D.M.

Regardless of the fact that Katie and William's individual claims must be arbitrated, the claims they bring on behalf of their minor children, G.M. and D.M., are not subject to the BDRA. Louisiana Civil Code article 3101 provides that tutors of minors cannot bind minors to arbitration without court authorization.  There is no court authorization here.  In *Snyder*, the court held that, by virtue of article 3101, a minor was not bound to his father's arbitration agreement.  899 So. 2d at 64.  The same holds true here.  Moreover, in the face of positive law prohibiting binding minors to arbitration without a court order, the Court cannot apply equitable estoppel to bind G.M. and D.M. to an arbitration clause in another person's contract.  *See Police Jury of Calcasieu Par. v. Indian Harbor Ins. Co.*, 395 So. 3d 717, 729 (La. 2024) (holding that "equitable estoppel is not available [to enforce an arbitration clause when] it conflicts with the positive law" prohibiting the use of arbitration in the relevant context).   Accordingly, Katie and William's claims brought on behalf of D.M. and G.M. are not subject to the BDRA, but they must be stayed pending the outcome of the arbitration.  *See Esch v. CMH Homes, Inc.*, 2024 WL 716054, at *3 n.5 (N.D. Miss. Feb. 20, 2024) (noting that "[t]he Fifth Circuit has held that where other claims in the same case 'are based on the same operative facts and are inherently inseparable,' the non-arbitrable claims may be stayed pending the outcome of the arbitration." (quoting *Harvey v. Joyce*, 199 F.3d 790, 795-96 (5th Cir. 2000))).

---

[66] *See* R. Doc. 2-1.
[67] *Id.* at 7.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Defendants' motion to compel arbitration and stay proceedings (R. Doc. 16) is GRANTED as to the claims brought by Mary and by Katie and William in their individual capacities, which are compelled to arbitration.

IT IS FURTHER ORDERED that the motion is DENIED as to the claims brought by Katie and William on behalf of their minor children G.M. and D.M.

IT IS FURTHER ORDERED that the entire case is STAYED pending arbitration.

New Orleans, Louisiana, this 21st day of May, 2026.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE

17